Counsel, you may proceed. Thank you, Your Honor. May it please the Court, my name is Bill Pellandini. I represent the interveners in the underlying district court case, Simpson Housing Limited Partnership, Great West Contractors and their related entities. The issue in this appeal goes to the question of, under what circumstances may an insurance company deny coverage for the alleged willful non-cooperation by its insured? Counsel, I don't know. Where is MDF at the moment? Where is MDF? MDF is not in the room, obviously. MDF is principally dissolved. MDF was a subcontractor on the project. My clients were sued by the Homeowners Association, brought all the subcontractors in, collected a judgment, a default judgment against MDF, intervened in the district court action, the coverage action. Did MDF participate in the action which Judge Mossman heard? No. Did not, OK. So there was a default, not a default judgment, but a default taken against them by insurance. I'm sorry, I didn't mean to interrupt my colleague. Oh, no, that's fine. Because I'm sort of going to interrupt you a little bit, because I don't know when to ask this that will be the least disruptive, so I'll ask it now. All right. Your people are here on the basis of a diversity action, correct? Correct. I don't see anything in the record that indicates that the court was ever told who the owners of the LLCs were. And my understanding is that to have diversity, every member of the LLC must have diversity. I don't see anything in the record that tells us that every member of this LLC is diverse. I don't believe there was any proof on that point, nor any objection made on that point. It's jurisdictional. I understand. The procedural history was that the declaratory judgment action was filed by assurance against MDF. And then we moved to intervene in order to, one, oppose the coverage determination as asserted. You have to have diversity. Understood, Your Honor. But I don't believe that you're correct. I believe you're correct. There is nothing in the record, per se, that put forth the actual members of the LLC. Now, Great West Contractors, I believe, is a corporation under Colorado Law. It's also an LLC. I believe it's set in the law. You may be correct. I don't have that information right at my fingertips. And even when they're called corporations, they're treated like partnerships in terms of jurisdiction. Right. Oh, do we have jurisdiction or not? Well, I'm not sure I can answer the question, because I don't know what the composition of the LLCs were, to be honest with you, as I stand here today. I reckon someone should answer that. I think you're probably correct, Your Honor. And we can certainly provide that information if that is something that would be subject to supplementation of the record. We'll let you know, counsel. In terms of the actual issue of lack of cooperation, Oregon law is pretty clear, beginning with a case back in 1963, State Farm versus Farmers, which was developed in its scope by the Bailey versus Universal Underwriters case in 1967, that there are three, perhaps even four, elements that an insurer must establish. One, that it made a diligent and good faith effort to secure the cooperation of its insured. Secondly, that it made a good faith effort to investigate the claim, notwithstanding issues regarding cooperation. Third, that there must be the lack of cooperation by the insured must not be of inadvertence or by mistake, but must be willful. And the last element, that the insurer, notwithstanding all of the above, suffered some degree of prejudice as a result of the lack of cooperation. Now, it's important, I think, to note for summary judgment and for proof at trial, if it were to get that far, the insurance company must establish all of these elements in order to prevail. In order to defeat summary judgment at the trial court, my clients need only raise a question of fact as to one of those elements. And our view was that we more than raised a question of fact on more than one element and that the district court erred. The issue, of course, goes to the question of what exactly does an insurance company have to do? How far do they have to go? And I'm sure the panel has read the briefs and there's a lot of argument back and forth about what assurance did in terms of sending a letter. The first letter came back unclaimed. The second letter was served on the representative for MDF. And then there was another letter sent in January and that was returned as undeliverable. Defense counsel apparently wrote a letter when she was first appointed by assurance. And then her testimony in her deposition was she left some telephone messages as well, although that record was not developed very well on what those messages consisted of. But the question then became and becomes, is that enough? Is that all that the insurance company has to do? Now, in answer to that question, we offer two pieces of information, two kinds of evidence. The first one is the Big Dog evidence. Big Dog Enterprises was another subcontractor working on the same project, insured by Assurance Company of America, sued by my clients on a third party complaint just like MDF. Can you boil that down as your theory that the lawyer in this case should have done what the lawyer in Big Dog did? For two reasons, yes. One, it demonstrates what can be done and what Assurance did do in exactly the same situation. But there's an issue of ethics, isn't there? Whether the lawyer could have gone ahead and represented a client that refused to participate at all? I don't believe so. We've offered. You don't believe which? There is an ethical issue or not? I do not believe there is an ethical issue. I think the defense counsel for Big Dog acted properly. This is assigned defense counsel by an insurance company. There is an employee in our view, and I believe the ABA opinion that we cited in our briefing materials demonstrates this. There is an implied consent in the contract, because an insurance company not only has the obligation to defend, it has the right to defend and the right to control the defense. What the ABA opinion is, is all that's required ethically is that the attorney write a short letter to the insured saying, I've been appointed. There could be circumstances where a conflict could arise, and if so, you're my client and I take your interests. There is no requirement that the insured respond to that consent is implied. The ABA opinion goes on to say that under the circumstances where the insurance company is going to pay for the settlement and is prepared to do so, then there is no ethical issue regarding getting the consent of the insured. As I think the opinion said, most insurers would be delighted to have the insurance company pay a settlement and get them off the hook on that case. This is an insured who played very hard to get. Absolutely. Both, as to my clients, in the underlying case, because we took a default and a default judgment for the same reason. But interestingly, in this case, in the district court action, we took the next step, as Assurance did with regard to Big Dog. We hired an investigator and found Mr. Foster and interviewed him and obtained the declaration that we submitted as part of our record in opposition to summary judgment. That's the question for this. But Mr. Foster is not going to be in a position now to contradict his own statement, is he? I'm sorry. I don't know. His own statement. His declaration. His declaration. No, no, no. His declaration says, I don't remember getting letters. I – the only thing that he says in his declaration he remembers getting is something from a firm called Gordon Something, which happens to be Mr. Barrett's firm. What I mean is, can he contradict what is established by his defaulting to the complaint? I – Can he contradict the facts established by the judgment against him and whatever was proved up to get that judgment? For two reasons, I think the answer is yes. The first reason goes to the question of, not only must there be a lack of cooperation established, it must show that it was a willful lack of cooperation. What Assurance in the district court said was he didn't open his mail and he didn't answer phone calls. Those are intentional acts. That reference – or that means, therefore, ergo, that there was a willful failure to cooperate. We disagree. I think the court – the district court took the right approach on the question of whether or not my clients were bound by the default allegations in the complaint and said, well, as to the factual allegations, he didn't open his mail, he didn't answer the phone, were bound by that, and in fact, there would be no disagreement with that. That's the facts. The question is, were those acts – can you then conclude from that – those acts that there was an intent not to cooperate? And I'd draw your attention to a couple of things. In the State Farm case, the 1964 decision on rehearing, the court addresses this very point and says, a failure to cooperate doesn't mean that you win because you don't know why the insured is not cooperating. And that was the importance of submission of the declaration of Dave Mant, the insurance expert, who said the same thing. Do you know why he didn't cooperate? Because he wouldn't cooperate with anybody about anything, period. He willfully decided I'm not going to cooperate with anybody who tries to contact me or write to me. I think you said the same thing. He wouldn't cooperate with you, either. Well, I respectfully disagree. I think what he said was and is I'm not going to open my mail because I'm hiding from my creditors. I'm not going to answer my phone because I think they're going to take my house away from me. Does that mean that he would not? Of course, it's illogical, right? I'm sorry? So it's at least illogical if it's not willful. If I don't answer my mail, then my creditors can't do anything. Or if I don't answer my phone, then certainly they can't take my house away from me. It may be illogical. And maybe he's insane. But I think we presume people aren't insane. So the next step would be we presume that he intentionally decided he was not going to cooperate with anybody about nothing. But isn't the question, Your Honor, a more general one? And that is, again, what must an insurance company do? As Mr. Mapp points out in his declaration, as I think the State Farm case discusses in the rehearing decision, you don't know whether he's ill. You don't know whether he can read. You don't know whether he speaks English. You don't know until you ask. And what they did with Big Dog, they went out and asked. They hired an investigator to find Mr. Trelogin, who was the principal, the equivalent of Mr. Foster, the principal of Big Dog. And in the record is the insurance adjuster's record of his investigation. And they hired an investigator. They found Mr. Trelogin. Now, in that case, notwithstanding the fact that they had contacted him personally, he still didn't cooperate. Nevertheless, Assurance continued to defend all the way through settlement. Counsel, I've got a question about the status of the law in the State of Oregon. We've got Stockton, Allegretto, and Reuter. Is it your view they're all in sync? No, I just don't think they apply, because they all default with default judgments, not defaults. And I think under any concept of fairness and issue preclusion in Oregon or under the federal law, there can be no adverse preclusion on behalf of my client without some privity of interest. And the cases, Reuter and McManamie, the case we cited, and I think Stockton as well, even though they're really talking about adjudication on the merits, they put it in the context of privity in the sense that without an adjudication, there can be no commonality of interest, no demonstration that the debtor, in fact, protected his interest and or was adversely affected by it. So your view is that the State Farm case is the case that controls. Is that right? Well, I think it is a controlling case. I think you have to look at all of them. The stretch that I think Assurance makes, and I'm really out of time because I was hoping to save some, but I'll answer this question, of course, is the law is certainly under the Direct TV case that a default, the allegations and the complaint are binding on the defendant, the defaulting defendant. The next issue, which I think the district court got right, is, well, what implications does that have for the third-party creditor? And then the district court, I think, came to the wrong conclusion, but I think then evaluated was it willful and was there prejudice. All right. You might want to reserve the rest of your time. Yes. Thanks very much. All right. We'll hear from the other side. May it please the Court. And good morning, Your Honors. Good morning. I'm Craig Barrett. I represent the Respondent Assurance. I would like to take a brief moment just to document our understanding of the factual efforts by my client and what happened in this case in terms of the efforts to locate and gain the cooperation of the insured. I think it's simplistic and not fully explanatory to say that a defense lawyer was retained who made a few phone calls and sent a few letters. This case, when it came to my client, was not even tendered by the insured. There was no request for a defense by the insured. My client gained knowledge of the lawsuit because it had actual knowledge of the suit against Big Dog Construction and had received an additional insured tender on behalf of Mr. Pellandini's clients. MDF Framing never requested that assurance do anything. Despite that lack of a request and lack of any actual duty to defend the case, it sought to do it anyways. It went out of its way to hire defense counsel. Can I clarify that point then? Are you saying that if you had not ever gotten notice of the underlying action that you would have no obligation at all? If no notice had been received, there would have been no duty to defend or indemnify, correct, Your Honor? Right. Ms. Parris, upon receiving the case, does what most lawyers do, begins making phone calls. For background information, Ms. Parris had been involved in prior litigation involving MDF Construction, a prior entity, a different corporate entity under which the family had conducted the business before MDF Framing was formed. She knew Otto Foster, Jr. and she knew Otto Foster, Sr. She knew where he lived. She left messages at that house and she sent letters to that house. When those did not garner a response, she informed the insurer that she believed she was getting into a difficult ethical area. Under Oregon law, there is a tripartite relationship when the insurer requests and consents to a defense by an insurance company. Ms. Parris, and we believe properly so, decided that she could never become the lawyer of Mr. Foster, Jr. until he, A, knew she was trying to do that and, B, consented to that. Is there any actual law on that or is that just her feeling? Because counsel argues that there's implied consent through the insurance policy itself. I appreciate that, Your Honor. Our position is that Oregon law is clear, that an attorney-client relationship is formed when your client forms a subjective belief that the attorney is acting in their behalf as counsel for that matter. How would we know one way or the other here? Well, here- In other words, how would she have known? I mean, she sent a letter. He may have opened the letter, for all she knew, and decided he wasn't going to object. He had a subjective belief that they were going to represent him, so he didn't do anything. He didn't feel it was necessary. That's one possibility, Your Honor, and Ms. Parris recognized that she was in an area where she didn't believe she had made a record, that the insured, in fact, knew she was attempting to be the lawyer, and she had not demonstrated consent. So even to the extent that there was ambiguity in that regard, she faced the ethical difficulty of, what do I do now? She instructed assurance. At that point, assurance sent a certified letter to the address that Mr. Foster ultimately was found at. That was returned as unclaimed. At that point, assurance didn't stop their efforts. They retained my office. And my task was to make sure that this insured was located, and make sure that, in fact, the letters being mailed, in that case, were six years after they had originally been found. So I assume that you will tell us if any of this is outside the record. I assume it's all in the records. No, this is in the record, Your Honor. And what happened at that point was a third-party investigator was hired to go out and locate this man, Otto Foster, Jr. He, in fact, did locate him, and he personally placed in this man's hand a letter that explained all of the implications of this. And I don't think there's any dispute that the correspondence itself adequately advised the insured of the issues, that the insured, in fact, was personally delivered correspondence explaining those issues, that the correspondence explained that in the event there wasn't a response, the next step would be a declaratory proceeding to compel him in Federal court to show up and respond to these issues. None of that's disputed. Obviously, Mr. Foster, again, chose to ignore his mail. And I will note that this is unique and that this isn't just mail. I think one should account for the unusual nature of how this correspondence is delivered. The gentleman showed up and confirmed his identity and physically placed this correspondence in his hand. I submit to you that's a little different than simply not going out to your mail. Just to clarify, is this, you said he was an investigator, that he's a process server? I believe the man was an investigator, process server was his title. But basically, he was there just like normal process servers. He just, his duty was to put it in Foster's hands. His task was to confirm that the individual was, in fact, Otto, Jr., and then place the letter in his hand. So he didn't have any duty or responsibility or task to converse with Foster? That's correct. So he wasn't, in that sense, an investigator. He was just basically a delivery person. A person locator and someone who provides documentation. All right. I made that qualification, Your Honor, because if I recall correctly, he really was an investigator. But I concur with you in this case, he wasn't. I'm just reading from your complaint, called him a process server. From that point forward, assurance brought a declaratory action in federal court against the insured. And that declaratory action had alternative claims. It either sought a declaration that assurance could defend this and that the insured must consent and cooperate, or there would be negative implications and you're not cooperating, you'll lose your coverage. The insured did not show up in the declaratory action, and the default was taken. That's the factual efforts in terms of all the matters that were undertaken by assurance in an effort to gain cooperation. Could you come back to the big dog point, because you now related that your firm got brought, were you brought in, are you the one that hired the process server? Yes. So assurance was having a comparable problem, it appears, with big dog. And in their case, in that case, the attorney had the equal difficulty in obtaining consent of the client. And yet assurance did not seem bothered by that because the attorney proceeded. So why didn't, why isn't it reasonable to ask why the insurance company didn't figure out which of the two attorneys was complying with Oregon law? I don't think it's unreasonable to ask that question. I can tell you that there were different claims personnel who handled the two. So that doesn't excuse assurance, that just simply says that the company had lack of cooperation from the insured was not an impediment to proceeding with the defense because the attorney who was representing that insured proceeded regardless of the client's subjective consent. So why isn't it appropriate for that to be an issue presented to a jury to all the efforts that should be done to prove your affirmative defense of failure to cooperate? Yes, my response, Your Honor, is twofold. A, in the big dog case, the defense of failure to cooperate wasn't asserted. And so the company wasn't attempting to avoid a coverage obligation in that case. Well, I'm not, whether it's, whether the failure to cooperate is in this case, which is being asserted. And I'm just looking at parallel behavior that whether it was different claims agents or not, I suppose there's the notion of constructive knowledge of the company, the insurance company, and it has two proceedings under its obligations as an insurer, one of which the attorney that it has retained has actually proceeded regardless of the problems that Mr. Price or whatever name was who ultimately dropped out. So why isn't that a factual issue that a jury would have to resolve? It's not a disputed issue of fact, Your Honor. And in all candor, I believe the attorney in the big dog case acted erroneously. I believe my client acted erroneously in that case in moving forward and entering an appearance and entering into a settlement in the name of big dog construction without the insurer's knowledge or consent. I believe that was erroneous. I know, but just help me understand this. We're on summary judgment, okay? The issue is whether there's a disputed issue of fact. And you're now giving me legal reasons why big dog is not a factual, relevant fact. Correct. Was that resolved by the district court? I forget. Did the district court conclude that the reason it's not a disputed issue of fact is because big dog is legally irrelevant because the attorney in that violated the code of ethics? The district court in its order does not address the manner in which he treated the big dog evidence. So we just have to accept your belief, or we have to resolve whether or not there was, we have to answer that question ourselves. I think you have to ask yourself whether or not the claims handling of another file somehow creates a material issue of fact as to the legal issues in this case. Well, it's a factual issue as to what the insurance company has to do. And what you're telling us here, your argument today is we should decide this as a matter of fact, that you proved everything that was necessary to prevail on affirmative defense, notwithstanding their argument that as a factual matter, insurance did something more in a different case. And there is proffered evidence from experts on their part that there was no legal impediment, ethical impediment to insurance and its retained attorney doing the same thing in this case. And I believe the distinction I make, Your Honor, is that is the conclusion that because insurance and its lawyer in that case did X in the big dog case, that there was no legal impediment to doing it. It may well be, and it is our position, that there was a legal impediment to doing it, and that Mr. Gilbert in that case should not have undertaken the defense or settled in the name of big dog without that entity's knowledge or consent. So if we- In other words, if he had hired, if the lawyer in the other case had hired a hitman to take out the claimant, it wouldn't be required to hire a hitman in your case to take out the claimant. Is that what you're saying? I'm really sure that I shouldn't answer the hitman strategy. We won't hold it. It's all prevalent. But just to follow through, I just want to understand what our task is here, because they've proffered that as a disputed issue, and you're saying we can ignore it because, as a matter of law, it was big dog who was wrong and the attorney in this case was correct to withdraw. If we disagreed with that, would there then be a legitimate disputed issue of fact? I don't believe so, Your Honor, because I don't think it's a- It doesn't create an issue of fact. It begs the question of legally in which scenario did the company act correctly? Which was the right way to act legally? Was it the way the lawyer handed the big dog case or was it the way the lawyer handled the MDF framing case? But I don't think it creates any dispute of fact. It's a question as to what do those facts mean. All right. So, again, believe me, I'm not trying to harass you. I'm trying to wrestle this through. The question then presented is let's hypothetically assume that the big dog attorney, we conclude for the reasons argued by your opponent, did everything that was appropriate and took the case to a successful conclusion with the participation of the insurance company. But that effort did not happen in this case because the attorney assurance hired incorrectly assumed that she could not do anything more, couldn't make an appearance, couldn't fight off, couldn't defend the underlying action, couldn't have worked with insurance to come up with a settlement on the underlying action, there would have been a favor, at least money would have changed hands and we wouldn't be here today. So why isn't that an appropriate scenario? I don't. I think you and I, Your Honor, are discussing different implications of the same facts. I don't dispute that factually in the big dog case, assurance through a different lawyer, in fact, did do what you say. I question whether or not that creates an issue of fact with respect to MDF framing. It's simply evidence that in a different scenario, my client through a different lawyer acted differently. I don't think that tells us anything factually about our case. Thank you. Thank you, counsel. Your time has expired. Thank you. Mr. Palandini, you have about a minute or so left, a minute and 23 seconds. Thank you. Can I return just to the jurisdictional issue because it is important? I do recall there is the old ancillary jurisdiction rule has been changed in the Federal Rules of Civil Procedure. I think it gives the district court authority to maintain jurisdiction in the absence of diversity when the issues are closely related to the main action, which they obviously are in this case. So, again, I haven't done any research on it recently, but I believe that there is such a rule and, therefore, a basis for the district court to maintain juris diversity. Let me go to another question. That's the willfulness and why Big Dog and Mr. Foster's declaration are important. If you look at the State v. Young case, which was cited by assurance for the proposition that and the district court that the failure to open letters is evidence of intentional lack of cooperation. In the State v. Young case, it was an employment benefits case having to do with overtime. But what the Supreme Court said in that case was if there was a bona fide belief in that case that these payments, these overtime payments were not due, then it couldn't have been willful. And I'd suggest that that's the same situation we have here. If Mr. Foster did not form the subjective belief that he intended not only not to open this mail, that he wasn't going to cooperate, there has to be some proof on that. These are questions of fact that a jury is entitled to resolve. Thank you. Thank you, counsel. The case just argued will be submitted for decision, and we will adjourn.
judges: O'scannlain, Fernandez, Fisher